# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

_____

In Re:
**BAR GW RANCH AND
TRUCKING LLC,**

             **Debtor.**

**Bankruptcy Case
13-40029-JDP**

_____

**R. SAM HOPKINS, Chapter 7
Trustee,**

             **Plaintiff,**

**vs.**

**KATHLEEN A.
MCCALLISTER, Chapter 13
Trustee,**

             **Defendant.**

**Adv. Proceeding
No. 13-8049-JDP**

_____

## MEMORANDUM OF DECISION

_____

**Appearances:**

    James A. Spinner, SERVICE & SPINNER, Pocatello, Idaho, Attorney
for R. Sam Hopkins, Chapter 7 Trustee, Plaintiff.


MEMORANDUM OF DECISION – 1

Alexandra O. Caval, Boise, Idaho, Attorney for Kathleen A.
McCallister, Chapter 13 Trustee Defendant.

## *Introduction*

In this adversary proceeding, bankruptcy trustees dispute which of

two respective bankruptcy estates is the rightful home for the cash

proceeds from the sale of a Peterbilt truck.  Following briefing, the Court

conducted a trial on July 10, 2014, after which it took the issues under

advisement.  This Memorandum Decision sets forth the Court's findings of

fact and conclusions of law.  Fed. R. Bankr. P. 7052.

## *Facts*

The material facts giving rise to this contest are not disputed;  most

are taken from a stipulation filed as an exhibit at trial.  Exh. 117.

In 2004, Clyde Garry White and Geneal Garbanati White began their

trucking business.  They originally conducted business under the name

"Bar GW Ranch and Trucking" ("Bar GW") although they never filed a

certificate of assumed business name with the Idaho Secretary of State.

When they purchased a 1999 Peterbilt truck, VIN 1XP5DB9X9XD483074

MEMORANDUM OF DECISION – 2

("Peterbilt") in January 2007, they titled it in the name of "Bar GW Ranch

and Trucking." Exh. 100 at 7. However, when they filed a Sales Tax

Exemption Affidavit for Authorized Interstate Carriers with the State of

Utah on January 5, 2007, concerning the same transaction, they listed the

purchaser of the Peterbilt as "C. Garry White DBA Bar GW Ranch &

Trucking." Exh. 100 at 10. Then, when they filed an Idaho Sales Tax

Exemption Certificate for the Peterbilt deal on January 8, 2007, they listed

the buyer as "Bar GW Ranch & Trucking." Exh. 100 at 9.

On May 3, 2010, the Whites reorganized their business into an Idaho

limited liability company they called "Bar GW Ranch & Trucking LLC".

Exh. 101. They did so on the advice of their insurance agent who

expressed concern to them about their risk of personal liability since the

Peterbilt was being used to haul honey bees, a high value, high risk,

commodity. The members of the LLC were Garry and Geneal. *Id*.[1] The

title certificate to the Peterbilt was not reissued following the formation of

---

[1] The Certificate of Organization for the LLC was amended in November 2011, and again in July 2012, to add and remove employees as members or officers. Exhs. 102, 103. The name of the LLC was not changed.

MEMORANDUM OF DECISION – 3

the LLC and prior to the filing of the bankruptcy cases, discussed below.

Prior to 2011, Garry and Geneal managed the trucking business themselves. However, after Garry developed some health problems, the LLC hired employees to manage the business. The first manager was Dillon Randall ("Dillon") hired in approximately November 2011. Following his departure, in July 2012, the LLC hired Kelli Merrill ("Kelli") to manage the business. Exhs. 102, 103. Kelli's employment was terminated in September 2012.

Dillon and Kelli made several changes to the operation of the business during their tenures. First, they allowed trucks owned by others to operate under Garry's trucking authority in exchange for monthly "rent" paid to the LLC for use of that authority. In addition, the managers made numerous changes in the financial practices of the LLC. When Dillon began to manage the business, he enlisted a different accountant than had been previously used. Prior to that time, tax returns for the business operations had always been filed as a Schedule C to the Whites' individual return. Exh. 113. However, the new accountant advised this

MEMORANDUM OF DECISION – 4

method of tax reporting was incorrect; he had the LLC obtain an employment identification number ("EIN") and file a separate entity tax return.

For some reason, when Kelli was hired, she obtained a yet different EIN for the LLC, and thus in 2012, the LLC filed two tax returns, each bearing a different EIN. Exhs. 110-111. The accountant attempted to apportion that year's income and expenses between the two returns. Exh. 112.

When Dillon was hired, changes were also made to the LLC's insurer, and a separate bank account was opened for the LLC, which had previously been using Bar GW's bank account. Deposition of Glyde Gary [sic] White, 18:76-77, March 25, 2014. Dillon opened up an account with Wells Fargo Bank for the LLC, but when Kelli took over the business, she moved the LLC's account to the Bank of Idaho. White Dep. 77:4-11.

On January 11, 2013, the Whites commenced a chapter 13 bankruptcy case. Case No. 13-40027-JDP, Dkt. No. 1. Later that same morning, the LLC filed a chapter 7 bankruptcy petition. Case No. 13-

MEMORANDUM OF DECISION – 5

40029-JDP, Dkt. No. 1.[2]  On January 18, 2013, the LLC was formally

dissolved via a filing with the Idaho Secretary of State.  Exh. 105.

On January 28, 2013, after the bankruptcy filing, and without Court

approval, the Whites sold the Peterbilt to Craig Wadsworth for $17,000;

the title certificate was transferred to him on February 11, 2013.  Exh. 100

at 5.  Thereafter, the Whites proposed a chapter 13 plan which included a

proposal to turn over the Peterbilt sale proceeds to the chapter 13 trustee

for distribution to unsecured creditors.  Exh. 301 at ¶ 1.1.2.  The Whites'

plan was confirmed by the Court on July 9, 2013.  White Dkt. No. 42.  On

advice of their bankruptcy counsel, the Whites forwarded the sale

proceeds to Kathleen McCallister, the trustee in their chapter 13 case.

R. Sam Hopkins, the trustee appointed in the LLC's chapter 7 case,

concluded that the Peterbilt sale proceeds were property of the LLC

bankruptcy estate.  Consistent with this belief, when McCallister would

not surrender the proceeds, on October 15, 2013, Hopkins commenced this

---

[2]  For convenience, the Whites' bankruptcy case docket is referred to as
"White Dkt." while the LLC's will be referred to as "LLC Dkt.".  The docket of
this adversary proceeding is referred to as "Adv. Dkt."

MEMORANDUM OF DECISION – 6

adversary proceeding against her seeking an order compelling her to give

him the money to administer in the chapter 7 case.  Adv. Dkt. No. 1.

Pursuant to the order confirming Whites' plan, McCallister is

holding the proceeds in her trust account pending the resolution of this

action; if she successfully defends against Hopkins' claims to the proceeds,

the order provides that she will distribute them to Whites' unsecured

creditors.  White Dkt. No. 42.

The dueling bankruptcy trustees now ask the Court to resolve their

claims so one of them can distribute the funds to the respective creditors in

the bankruptcy cases.

### *Analysis and Disposition*

When a bankruptcy petition is filed, all "legal or equitable interests

of the debtor in property as of the commencement of the case" are

included in the debtor's bankruptcy estate.  § 541(a)(1).  Property of the

estate also includes the proceeds from a disposition of any estate property.

§ 541(a)(6); *Krommenhoek v. Covino (In re Covino)*, 99.9 IBCR 138, 144 (Bankr.

D. Idaho 1999).  While the scope of the bankruptcy estate is wide, it is "not

MEMORANDUM OF DECISION – 7

so broad as to 'expand a debtor's rights in property over what existed as of the date of filing.'" *Gugino v. Knezevich (In re Pegram)*, 395 B.R. 692, 695 (Bankr. D. Idaho 2008) (quoting *Farmers Ins. Group v. Krommenhoek (In re Hiatt)*, 00.3 IBCR 131, 132 (Bankr. D. Idaho 2000) (citations omitted)).

In a bankruptcy case, the estate's property rights are determined according to state law. *Butner v. United States*, 440 U.S. 48, 55 (1979); *In re Aldape Telford Glazier, Inc.*, 410 B.R. 60, 64 (Bankr. D. Idaho 2009). Relevant here, the Idaho motor vehicle title statutes provide that:

> no person acquiring a vehicle from the owner, whether the owner is a dealer or otherwise, shall acquire any right, title, claim or interest in or to the vehicle until he has issued to him a certificate of title to that vehicle, nor shall any waiver or estoppel operate in favor of that person against a person having possession of a certificate of title or an assignment of the certificate of the vehicle for a valuable consideration.

Idaho Code § 49-503. The courts, including this one, have strictly construed this provision "to promote the underlying legislative policy that vehicle ownership be determined exclusively by reference to the name on the certificate of title." *In re Pegram*, 395 B.R. at 695 (citing *Hopkins v. Brasseaux (In re Saunders)*, 08.1 IBCR 16, 17 (Bankr. D. Idaho 2008)); *Hopkins*

MEMORANDUM OF DECISION – 8

*v. Frazier (In re Tews)*, 502 B.R. 566, 570 (Bankr. D. Idaho 2013). Simply put, in Idaho, a party has "no cognizable ownership interest in a vehicle where no certificate of title [has] yet been issued in that party's name." *In re Woods*, 386 B.R. 758, 762 (Bankr. D. Idaho 2008) *citing Hopkins v. Shradley (In re Shradley )*, 03.1 I.B.C.R. 7, 8 (Bankr. D. Idaho 2003).

Unfortunately, in this case, the name on the title certificate for the Peterbilt did not precisely match the names on the bankruptcy petitions filed by either the Whites, individually, or the LLC. Hence, the disagreement between the trustees. As the trustee of the Whites' chapter 13 case, McCallister contends that, despite titling it under Bar GW, it was the Whites who initially purchased the Peterbilt, and their ownership continued until the truck was sold after they filed the bankruptcy cases. Thus, she contends the Peterbilt belonged to the Whites on petition day, and the truck, and now its sale proceeds, became property of the Whites' bankruptcy estate.

On the other hand, Hopkins, the trustee in the LLC's case, argues that the Whites contributed, assigned, or transferred their legal or

MEMORANDUM OF DECISION – 9

equitable interests in the Peterbilt to the LLC when it was formed.

Hopkins further contends that because neither the Whites nor the LLC are

properly listed on the title certificate for the Peterbilt, the title statutes do

not control, and the Court can consider other indicia of ownership to

resolve this dispute.  In Hopkins's view, that "other" evidence, such as the

fact that the Peterbilt was used for years in the business, all favors the LLC.

The case presents a perplexing dilemma, indeed.

## 1.  The Effect of an Assumed Business Name

In Idaho, an assumed business name, or "DBA" designation, is a

name under which another entity does business; it is not the legal entity's

"true name."[3]  *Wicklund v. Page*, 09-CV-671-EJL-CWD, 2010 WL 5572813 (D.

Idaho Aug. 6, 2010) (noting that the "term "DBA" is the abbreviation for

"Doing Business As," which is a slang term for "Assumed Business

Name."), Report and Recommendation adopted, 1:09-CV-00671-EJL, 2011

---

[3]  "True name," as applied to an individual, is defined by the statute as "the name which the individual uses to bind himself or herself to legal obligations, or to obtain privileges, licenses or benefits from government."  Idaho Code § 53-503(7)(b).

MEMORANDUM OF DECISION – 10

WL 98544 (D. Idaho Jan. 7, 2011); *In re Aldape Telford Glazier, Inc.*, 410 B.R.

63 at n.6.  According to the Assumed Business Names Act of 1997, Idaho

Code §§ 53–501 *et seq*. (the "Act"), an "assumed business name" means:

> Any name under which any individual, any group of
> individuals or other persons, or any entity other than a
> formally organized or registered entity, holds itself out for the
> transaction of business in the state of Idaho, if that name does
> not include in full the true names of all individuals and other
> persons who have a financial interest in the business which is
> or may be transacted. . . .

Idaho Code § 53-503(1)(b).  The Act requires any person who intends to

conduct business under a name other than his or her true name to file a

certificate of assumed business name with the Secretary of State.  Idaho

Code § 53-504.  "The purpose of [the Act] is to ensure disclosure on the

public record of the true names of persons who transact business in

Idaho."  Idaho Code § 53–502.  It is undisputed that the Whites never

registered Bar GW Ranch and Trucking as an assumed business name with

the State of Idaho.

   The Act also spells out the consequences for noncompliance with

Idaho Code § 53-504:  1) the noncompliant entity is not entitled to maintain

MEMORANDUM OF DECISION – 11

any legal action in Idaho courts until compliance is achieved; and 2) losses

to others due to noncompliance will result in an award of damages and

attorneys fees and costs against the noncompliant entity.  Idaho Code § 53-

509; *Noreen v. Price Dev. Co. Ltd. P'ship*, 25 P.3d 129, 134 (Idaho Ct. App.

2001).  Notably, the Act provides no other protections or benefits for

complying with the requirement to file the certificate, beyond the ability to

maintain an action in Idaho courts, and eliminating the potential for

damages to others due to noncompliance.[4]  Importantly, the filing of a

certificate of assumed business name does not create a separate legal

entity.  *See Salazar v. Tilley*, 716 P.2d 1356, 1357 n. 1 (Idaho Ct. App. 1986)

("Because an assumed business name is nothing more than another name

for a recognized legal entity, an assumed business name is not a separate

entity in its own right."); *O'Banion v. Select Portfolio Servs., Inc.*, 2011 WL

---

[4]  As the case law currently stands, "[t]he only remedies or consequences
of noncompliance prescribed in the Act itself are those provided in [Idaho Code]
§ 53-509." *Winn v. Campbell*, 184 P.3d 852, 856 (Idaho 2008).  While the Idaho
Supreme Court has hinted at the possibility that noncompliance may provide a
basis for the tolling of the statute of limitations in which to amend a complaint, it
has not yet been presented with facts to support such a stance. *Wait v. Leavell
Cattle, Inc.*, 41 P.3d 220, 225 (Idaho 2001).

MEMORANDUM OF DECISION – 12

5572625, at *9 (D. Idaho Nov. 16, 2011) ("Under Idaho Code § 53–503(1)(a),

an Assumed Business Name is a name under which a legal entity does

business, but it is not the legal entity's 'true name' under which it was

organized and registered with the State.  Because an assumed business

name is nothing more than another name for a recognized legal entity, an

assumed business name is not a separate entity in its own right.").

Because the Whites' usage of the assumed business name Bar GW

Ranch and Trucking did not create a separate legal entity, the fact that the

Peterbilt was titled under that name did not effectively place ownership of

the vehicle in any entity other than the Whites as individuals.  The

ownership of, and liability for, the Peterbilt, remained with the Whites.  *See*

*Colorado Milling & Elevator Co. v. Proctor*, 76 P.2d 438, 440 (Idaho 1938)

("Like any individual, a corporation may assume a name other than its

legal name and carry on business in such assumed name, but in order to

apply this doctrine, incorporation by some name must be established.  If a

note or deed is executed by a corporation under an assumed name, it is

just as much bound as if it had used its proper name, and the same is true

MEMORANDUM OF DECISION – 13

of any other contract. A contract entered into by or with a corporation

under an assumed name may be enforced by either of the parties, if the

identity of the corporation is established by the proof.") (citing FLETCHER

CYC. CORPORATIONS, Permanent Ed., vol. 6, p. 87, § 2442); *In re Laraway*,

2010 WL 4244251, at *4 (Bankr. D. Idaho Sep. 13, 2010) (an individual

registered an assumed business name but later incorporated that same

name. When contracting with the plaintiffs to construct their home, the

documents indicated the assumed business name was the general

contractor and the defendant did not make it clear he was acting in a

representative capacity for the corporation and thus he remained

personally liable on the breach of contract); *see also, In re Ross*, 2010 WL

610369, at *1 (Bankr. D. Conn. Jan. 20, 2010) (title to property deeded to

"Michael Ross dba Ross Siding Co., LLC dba RSC Construction" was held

by Michael Ross as an individual). Accordingly, the Whites' usage of an

assumed business name, and their decision to title the Peterbilt under that

name, did not effectively establish ownership of the Peterbilt in any entity

distinct from the Whites as individuals.

MEMORANDUM OF DECISION – 14

In contrast, taking the necessary steps to organize the business as an Idaho LLC does give rise to the legal separation of the interests of the business from those of its members.  Idaho Code § 30-6-104(1) ("A limited liability company is an entity distinct from its members"); *Wandering Trails, LLC v. Big Bite Excavation, Inc.*, 329 P.3d 368, 376 (Idaho 2014); Idaho Code § 30-6-304 (The debts and obligations of a limited liability company belong "solely" to the company and "[d]o not become the debts, obligations or other liabilities of a member or manager solely by reason of the member acting as a member or manager acting as a manager.").  A person may become an LLC  member without making any contribution to the company.  Idaho Code § 30-6-401(4).  Accordingly, for ownership of their assets or properties to become a part of the LLC, the Whites necessarily had to transfer, sell, or assign that property to the company as a contribution.  There is no evidence they did so with respect to the Peterbilt.  The similarity in names between Bar GW and the LLC is not sufficient to show the truck was transferred to the LLC.  And the fact that the Whites owned the Peterbilt as individuals while simultaneously acting

MEMORANDUM OF DECISION – 15

as members of the LLC is likewise insufficient. Indeed, if such were true, their home, personal vehicles, and other assets would also arguably be LLC property. While, admittedly, the LLC used the Peterbilt extensively in conducting its business, and while the company treated the Peterbilt as LLC property, doing so was apparently consistent with an informal arrangement between the Whites and their LLC. White Dep. 69: 10-13.

Hopkins points out that creditors and others doing a title search of Idaho records under the name of the LLC would much more likely discover the Peterbilt than would a title search for vehicles owned by the Whites. Assuming this is correct, though, does not render the LLC's claim to the Peterbilt superior to that of the Whites. The Idaho Code, and the cases interpreting it, make clear that the "legislative policy [is] that a motor vehicle may be owned by only one person at any one time – the person whose name appears on the official certificate issued by the State." Idaho Code § 49-503; *In re Woods*, 386 B.R. at 762 (citing *In re Shradley*, 03.1 IBCR at 8). Here, the title indicates the Peterbilt is owned by Bar GW, which, as an assumed business name, the Court has determined is the Whites

MEMORANDUM OF DECISION – 16

individually.  Therefore, according to Idaho law, title to the Peterbilt may

not also rest in the LLC, despite the similarity of its name to the DBA.

From this conclusion, it necessarily follows that the Peterbilt became

property of the Whites' bankruptcy estate when they filed their chapter 13

petition.  As such, when the Whites (improperly) sold the truck during the

bankruptcy case, the sale proceeds also became property of the Whites'

bankruptcy estate pursuant to § 541(a)(6).  As provided in the order

confirming Whites' chapter 13 plan, McCallister may distribute the sale

proceeds to Whites' unsecured creditors.

## 2.  Indicia of Ownership

To determine ownership of an Idaho motor vehicle, "indicia of

ownership is only considered when no title has been issued to any party

asserting rights to the vehicle."  *Gugino v. Canyon Fin. of Boise, Inc. (In re

Green)*, 410 B.R. 904, 908-09 (Bankr. D. Idaho 2009).  And as explained

above, the Idaho motor vehicle title laws can be reconciled with the

Whites' individual ownership of the Peterbilt.  However, even if indicia of

ownership were considered in resolving this dispute, the balance of the

MEMORANDUM OF DECISION – 17

evidence would nonetheless tip in favor of the Whites.

On one side of the scales, according to the original bill of sale, there is no question Garry purchased the Peterbilt.  Exh. 100 at 11; White Dep. 52:3-5.  He explained at the hearing that the loan used to purchase the Peterbilt was in his and Geneal's names, and funds from the Bar GW bank account were used to pay it off.  In addition, Garry signed both of the sales tax exemption certificates, Exh. 100 at 9, 100 at 10, as well as the application for the certificate of title, Exh. 100 at 7, in his own name.  Moreover, when the Peterbilt was sold to Mr. Wadsworth, both the bill of sale and the release of liability form list the seller as "Clyde Garry White." Exhs. 100 at 3, 100 at 5.  Simply put, there is no mention of the LLC on any of the documents, and loan payments were not made from the LLC's bank account.

Moreover, the Idaho Uniform Limited Liability Company Act provides that a member's,

> contribution [to an LLC] may consist of tangible or intangible property or other benefit to a limited liability company, including money, services performed, promissory notes, other

MEMORANDUM OF DECISION – 18

agreements to contribute money or property, and contracts for services to be performed.

Idaho Code § 30-6-402.  Hence, the Whites could have contributed the Peterbilt to the LLC when it was organized.  However, the record before the Court includes no evidence of any transfer of title, bill of sale, assignment, or other documentation intended to effect a transfer of the Peterbilt from the Whites/Bar GW to the LLC.  Garry confirmed that he never transferred the Peterbilt to the LLC, nor did the LLC pay the Whites anything to acquire the truck from them.  White Dep. 62:14-19. Furthermore, Garry testified that, while his intention was to protect he and Geneal from personal liability, he did not know he needed to change the title certificate to the Peterbilt to accomplish that.[5]  White Dep. 16:20-23.

---

[5]  Idaho Code § 49-2417 provides that an "owner" of a motor vehicle "is liable and responsible for the death of or injury to a person or property resulting from negligence in the operation of his motor vehicle, in the business of the owner or otherwise, by any person using or operating the vehicle with the permission, expressed or implied, of the owner, and the negligence of the person shall be imputed to the owner for all purposes of civil damages."  The statute defines "owner" as "a person, other than a lienholder, having the property in or title to a vehicle."  Idaho Code § 49-116(3).

MEMORANDUM OF DECISION – 19

He also repeatedly testified that he thought that he and Geneal owned the

Peterbilt, and that it belonged to them personally, and not the LLC.  White

Dep. 54:7-12; 59:14 – 60:2.

On the other hand, it is clear from the evidence that certain expenses

for the Peterbilt were paid by the LLC.  For example, in 2012, the insurance

policy for the Peterbilt lists the LLC as the insured, Exh. 107, the insurance

premiums were financed in the name of the LLC, and the payments were

made through the LLC's bank account, Exhs. 108 at 1, 108 at 3.

Furthermore, the interest payments on the Peterbilt loan were included in

the LLC's tax returns as business expenses.  Exh. 106.  Finally, the LLC also

paid to license the Peterbilt in 2012.  Exh. 110 at 1.

The remaining financial and tax return evidence is equivocal,

providing mixed signals regarding ownership of the Peterbilt.  To begin,

when the LLC was originally formed, the Whites did not set up a separate

bank account for the company.  Instead, they used Bar GW's account for

LLC business until Dillon was hired, at which time an LLC bank account

was opened.  The rent payments indicated in the tax returns appear to be

MEMORANDUM OF DECISION – 20

rents paid by others to Garry for the use of his authority, plus rent paid by

the LLC for use of the Peterbilt while Garry was not driving due to

medical problems.  White Dep. 24:3-17; 40:1-23; 44:15-18; 47:15-22.  It also

appears that the Peterbilt rents were paid first to the LLC, and some

expenses – though the nature of those expenses is unclear – were paid by

the LLC prior to the remainder of the rents being paid over to the Whites.

Hopkins contends the rents were paid directly to the LLC for the use of the

Peterbilt, and the Whites took a draw from those rents.  And from those

funds received by the Whites, whether as rents remitted or a draw, the

Whites paid more expenses, and possibly some involving the Peterbilt.  *See*

*generally* White Dep. 37:6-10 (the LLC ran the Peterbilt's expenses through

the LLC); 40:1-23 (Dillon/Kelli paid the LLC rent on the truck); Depo. 44:6-

14 (the LLC tax return shows $58,000 in repairs, which are mostly the

Peterbilt); 67:8-20; 75:6-9[6] (when Garry was recovering from heart surgery

---

[6] In more than one instance, the Court was left with an unclear picture of
how the money flowed, and what expenses were paid from the Whites' personal,
the Bar GW, and the LLC accounts.  Garry testified they kept "somewhat"
separate books for their personal finances and those of the LLC.  Depo. P. 53.
Moreover, the overall financial and tax picture of the LLC was complicated

MEMORANDUM OF DECISION – 21

and unable to work, the managers rented out the Peterbilt.  The rents were

paid to the LLC, expenses were paid, and the remainder went to the

Whites.  However, Garry testified that those funds the Whites received

from the LLC were used to pay the expenses for the Peterbilt); 76:6 – 77:3

(the Whites tried to pay the Peterbilt's expenses out of the Bar GW

account, and used their personal account to supplement); 60:7-24 (repairs

to the Peterbilt were on the LLC tax return, Exh. 110 at 1, but rental income

from the LLC's use of the truck was on the Whites' personal tax return, at

least for 2012); 53:20-25 (the LLC did not pay the Whites rent for the use of

the Peterbilt until Dillon took over).

Finally, the profit and loss statements for Bar GW and for the LLC

are not very helpful in divining the ownership of the Peterbilt.  First, while

one document is titled as the profit and loss statement for Bar GW, Garry

testified it was actually the Whites' personal profit and loss statement,

---

because of the hiring and firing of Dillon and Kelli as managers, and the changes
they instituted.  In addition, when Kelli was employed by the LLC, she
wrongfully used the company's credit card for her personal expenses, and thus
those expenses also show up on the LLC's bank and profit/loss statements.

MEMORANDUM OF DECISION – 22

despite its inclusion of what are clearly ranching expenses. Second, the

Whites did not prepare those statements, but rather sent the Quick Books

data files to their accountant, who used them to generate the profit and

loss statements. Finally, certain items are obviously missing from the

Whites' personal profit and loss statement, such as Geneal's monthly

disability income. Given their disorganized and inconsistent contents, the

Court assigns little evidentiary weight to the profit and loss statements in

the indicia of ownership analysis.

Of course, this documentary and other confusion in dealing with

their business, financial and asset affairs shows that the Whites were not

only unsophisticated about the legal intricacies of operating their business

via an LLC, but that they handled most all of the aspects of their business,

including the finances, extremely informally. Indeed, it appears they

were relatively distant from the decision making concerning the LLC's

operation and books and records, at least beginning in 2012 when Garry's

health concerns arose and Dillon, and later Kelli, were hired to manage the

business.

MEMORANDUM OF DECISION – 23

In sum, while in many respects equivocal or downright unhelpful, the weight of the evidence tips somewhat in favor of demonstrating that the Whites owned the Peterbilt rather than the LLC. They no doubt believe that they continually owned the truck, despite their organization of the business into an LLC for their protection. They were simply ignorant of their need to formally transfer ownership of the Peterbilt to the LLC insulate them from liability for its use in the business. At bottom, the Whites took no steps to effect a transfer of the Peterbilt, and instead continued to treat the truck as their individual property that belonged to them personally, even though they allowed the LLC to use and share in the income it generated.

### *Conclusion*

Applying either the policies and principles of the Idaho motor vehicle title laws, or by weighing the contrasting indicia of ownership, the Court finds and concludes that the Whites owned the Peterbilt when they filed their chapter 13 case. Because the Peterbilt was property of the chapter 13 bankruptcy estate, the proceeds from its later sale were also

MEMORANDUM OF DECISION – 24

estate property.  Therefore, McCallister is entitled to possession of the sale

proceeds to distribute under the terms of the Whites' confirmed plan.

Hopkins' complaint seeking an order requiring her to deliver the proceeds

to him will be dismissed.  A separate judgment will be entered.


Dated:  October 21, 2014

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION – 25